**EFFIE FILM, LLC, Plaintiff,**

v.

**Gregory MURPHY, Defendant.**

**No. 11 Civ. 783.**

United States District Court,
S.D. New York.

March 22, 2013.

Andrew Lawrence Deutsch, E. O'Brien Kelley, DLA Piper US LLP, New York, NY, for Plaintiff.

Benjamin Sahl, Cowan, Liebowitz & Latman, P.C., Robert William Clarida, Reitler Kailas & Rosenblatt, L.L.C., New York, NY, for Defendant.

### AMENDED OPINION

THOMAS P. GRIESA, District Judge.

This is an action for declaratory judgment brought by Effie Film, LLC against Gregory Murphy. Effie Film is a company formed to produce a film based on a

screenplay, "Effie," written by Emma Thompson [1] based on the infamous, unhappy marriage of Effie Gray and John Ruskin, a highly influential Victorian-era art critic. Murphy is also the author of a screenplay, as well as a play for the stage, (both entitled "The Countess") based upon the same historical events. Murphy has made repeated claims, both to Effie Film and in the media, that the "Effie" screenplay infringes on his copyright in "The Countess." Effie Film therefore has brought this action seeking a declaration that "Effie" does not infringe Murphy's copyright in "The Countess."

Effie Film moves for judgment on the pleadings. The motion is granted.

## Procedural History

When this action began, on February 4, 2011, the film "Effie" was in its earliest stages. The film had not yet secured funding and the cast had not been finalized. On March 1, 2011, Murphy moved to dismiss the complaint on the grounds that the dispute between Effie Films and Murphy was not sufficiently concrete to satisfy the "actual controversy" prerequisite to this court's jurisdiction.

While that motion was pending, however, work continued on "Effie"—funding was secured, a cast was finalized, the script was revised, and shooting was completed. Murphy also allegedly continued to air his contention that his copyright was being infringed throughout this time. Effie Film accordingly moved to amend its complaint to reflect these changed circumstances. The court denied Murphy's motion to dismiss and granted Effie Film's motion for leave to amend its complaint on March 6, 2012.

Effie Film filed its amended complaint the next day, on March 7, 2012, which Murphy answered on March 27, 2012. Effie Film then filed this Motion for Judgment on the Pleadings on May 29, 2012.

## The Pleadings

The following facts and allegations are drawn from the pleadings, the works incorporated by those pleadings, as well as a number of historical facts of which the court takes judicial notice.

### THE CONTROVERSY

The amended complaint seeks a declaration that the revised November 2011 "Effie" screenplay, and the movie made from that screenplay, do not infringe Murphy's copyrights in "The Countess." That revision of the script, the complaint alleges, is the final "shooting script" that was used in shooting the film and, though some dialogue may be added or removed at the margins during the editing process, the film will not deviate from the shooting script in any substantial way. While Effie Film has furnished the court with a copy of the shooting script, it has not provided a copy of the film. It seems safe to suppose that this is because the film is not yet complete.

But the complaint alleges that starting in 2009, when Murphy became aware of the "Effie" screenplay, Murphy has insisted that "Effie" is based upon his work in "The Countess." He made these assertions to Effie Film and to Thompson directly, he has made them through one of his associates, and he has made them in letters from his attorneys.

The complaint also alleges that Murphy has taken up this cause in the news media.

---

1. The original opinion issued by the court on March 20, 2013, 2013 WL 1150707 (S.D.N.Y. Mar. 20, 2013), inaccurately described the screenplay "Effie" as having been "written by Emma Thompson and her husband, Greg Wise." It is more accurate to say that the screenplay was written solely by Thompson, with Wise's assistance as a factual researcher.

On April 24, 2011, Murphy published a lengthy account in the Daily Mail Online entitled "The Day I Sat in Emma Thompson's Kitchen and Accused Her of Stealing my Movie." The title sums up the substance of the piece nicely.

The complaint alleges that, on May 14, 2011, an article appeared in the New York Post about this lawsuit which quoted Murphy as saying that "Effie" "follows the exact same time frame, has an identical tone and contains plot elements and character developments directly traceable to 'The Countess'."

The complaint alleges that, on October 30, 2011, an article appeared in the Daily Telegraph, also about this lawsuit, that quoted Murphy as saying that Effie Film's going ahead with shooting the film "shows contempt for the legal process" and indicated that Murphy would not rule out seeking an injunction to halt the film's distribution.

Finally, on December 26, 2011 the complaint alleges that Murphy made a post on Facebook alleging that "Effie" is based on "The Countess."

The result of these accusations, the complaint suggests, is that Effie Film will have difficulty distributing, marketing, and ultimately exhibiting the film. Given the current climate, distributors and other companies would have to face the risk of legal action—including an injunction against distribution of the film, as suggested in the Daily Telegraph article—if they agreed to participate in the distribution or promotion of "Effie."

It should be noted, however, that Effie Film's original complaint made similar contentions regarding its ability to secure financing and produce the film under the threat of litigation from Murphy. But financing was, in fact, secured and production of the movie has continued, seemingly unimpaired.

*HISTORICAL BACKGROUND*

Both "Effie" and "The Countess" present fictionalized accounts of the same historical events. Therefore, it is necessary to review the historical episode that both works draw from. The court should not attempt to record every historical detail that appears in "Effie" or "The Countess." Such an effort is unnecessary and, in any event, probably doomed to fail. But it will be impossible to gauge the creative similarities of the works without some grasp of the historical narrative.

John Ruskin was a preeminent art critic of the Victorian era. His renown has stemmed, in part, from his notable defense and nurturing (both theoretical and financial) of the Pre–Raphaelite Brotherhood. To oversimplify, the Pre–Raphaelites, with Ruskin, were united in their belief that the highest purpose of art was to celebrate nature. The Pre–Raphaelites rejected the emphasis on elegance and artificial "beauty" which, they supposed, were a result of Raphael's enduring influence on subsequent art and art criticism—hence the label "Pre–Raphaelite."

John Ruskin's father was acquainted with Effie Gray's parents who encouraged a match between their daughter and his son. The two met at an early age—he wrote the novel *The King and the Golden River* for her when she was twelve years old.

Eventually the couple married. But, infamously, the marriage was never consummated. Effie wrote that John had "imagined women were quite different to what he saw I was, and that the reason he did not make me his Wife was because he was disgusted with my person." John, for his part, stated that, though Effie was considered a great beauty "her person was not formed to excite passion. On the contrary, there were certain circumstances in her person which completely checked it."

Though not a matter of "historical fact," of course, the irony is obvious: John, evangelist for the artistic appreciation of the imperfections of nature, could not abide the natural appearance of his own wife.

This first encounter portended years of unhappiness to come for Effie. Their marriage would be characterized by John's continuing neglect of her and, by some accounts, his intentional attempts to soil her reputation by leaving her alone with other men. And over time John's disposition towards Effie matured into cruel hostility. He warned Effie that he would "break" her. He remarked to others that he could be rid of Effie whenever he wanted. He began to compile "evidence" of Effie's insanity so he could have her locked away whenever he wished to be rid of her.

Shortly after their wedding the couple travelled to Venice. John devoted his time there to researching his book *The Stones of Venice.* This left Effie to go out in Venetian society on her own where, evidently, she was very well received.

Upon returning to England, however, life became rather more grim. The couple moved into a home in Camberwell, in the suburbs of London. Their home was only a half-mile from the home of John's parents at Denmark Hill, whose over-protectiveness of John Effie came greatly to resent. Mr. Ruskin, John's father, in particular took to writing Mr. Gray, Effie's father, to constantly criticize Effie's behavior towards John and the Ruskins. The Ruskins supposedly resented Effie for being neither of high enough social status to be worthy of their boy John, nor meek enough to shrink out of the way of their big plans for him. Mr. Gray passed these criticisms along to his daughter with the result that Effie found the Ruskins' emanating influence totally oppressive.

It eventually came to pass that Effie and John, as well as John's servant Crawley, left Camberwell for a summer retreat in Scotland at Glenfinlas in the Trossachs. They were accompanied by John's close friend, the Pre–Raphaelite John Everett Millais. Millais was to use this trip to paint a portrait of John that would, they hoped, revolutionize both British portraiture and landscaping painting. Though this painting, naturally entitled "John Ruskin," may not have had the historic impact that John and Millais had hoped, it remains a Pre–Raphaelite work of some note.

This four-month sojourn proved to be a turning point. At Glenfinlas John remained absorbed in his own work and oblivious to his wife. Effie, meanwhile, began to sit as a model for Millais and a romantic bond formed between them. Both, it seems, began to wonder whether there might be a way for Effie to escape her loveless marriage to John. Millais' correspondingly cooled to John as he observed John's callous attitude towards his wife. By the time the group left Scotland, Millais could hardly stand to be in the same room as John.

After their return from Scotland John and Effie's relationship continued to deteriorate, and both Millais and Effie began to lay the groundwork for cutting ties with John. For Millais, this meant completing the detail work on John's portrait and finally handing over the finished work. But for Effie the situation was much more delicate. She began communicating with Lady Eastlake, a friend she had made through John's connection with the National Gallery in London. Lady Eastlake nee Elizabeth Rigby was apparently a woman ahead of her time—she was a prolific writer and keen art critic, the first regular female contributor to the *Quarterly Review,* and a crucial champion in Effie's bid to free herself from John.

Eventually, Effie confided to Lady Eastlake that her marriage to John had never

been consummated and Effie's path to liberation became clear. Lady Eastlake began to make both the necessary legal inquiries to have Effie's marriage to John annulled and the social maneuvers to ensure that, if Effie were to leave John, she could do so with her reputation and standing unscathed.

With the help of Lady Eastlake and Crawley, who had become attached to Effie and who Effie evidently trusted a great deal, a plan was put into motion. Effie made visits to a doctor and to the Doctor's Commons (in this latter case "doctor" actually refers to civil lawyers) where she was subjected to physical examination and questioning to confirm her virginity. Effie and her parents agreed that she would then tell John that she would be making a routine visit to her parents. What Effie did not tell him is that she would never be coming back. After Effie departed but before John's coming trip to Switzerland, John was served with a notice that his marriage was to be annulled.

Now free, Effie would eventually marry Millais, though not before waiting six months to see him. John would go on to court the then-teenaged Rose la Touche. La Touche, however, denied him and when she died at the age of 27 John was driven to insanity. John's relationship with La Touche eventually played a role in inspiring Vladimir Nabokov's great work, *Lolita*.

*"Effie"*

"Effie" begins its telling of Effie Gray's story at the end: it opens with a brief, enigmatic, sequence that the viewer would eventually come to understand depicted Effie's examination for virginity.

It then quickly moves back to the beginning of the story, with John and an eleven-year-old Effie admiring Bernini's "Apollo and Daphne." The two discuss the Daphne myth, drawn from Ovid's Metamorphosis, in which Daphne escapes Apollo's advances by turning into a laurel tree. This scene establishes the metaphorical identity between Daphne and Effie which, in turn, provides the film's central irony and its central theme: John's aesthetic ideology, that art should capture nature faithfully, flaws and all, does not extend to his regard for women—women remain significant only as vehicles for his idealizations (an attitude that, if women were literal works of art, one might call Hyper-Raphaelite). The association between Daphne and Effie, renewed throughout the screenplay when Effie is most oppressed, emphasizes the connection John's resentment to the reality of Effie as a woman and human—just as Daphne's reversion to nature "destroyed her beauty" (*See* Ovid, *Metamorphoses*, I.546), it is Effie's ineradicable natural reality that so repels John. The difference, of course, is that Daphne sought this form of obliteration.

The screenplay then quickly moves through the wedding preparations and some brief scenes to establish John's status as a prominent art critic and promoter of the Pre–Raphaelite brotherhood. It also moves quickly through the now ill-omened wedding to linger on the new couple's ersatz honeymoon at Denmark Hill. There, John's coldness towards Effie gains a Freudian dimension when the viewer is introduced to John's smothering mother. Here the screenplay takes its time—approximately seven pages [2] of dialogue—to amply illustrate Effie's immediate isolation

---

**2.** Note that the page counts indicated throughout this opinion do not correspond to the number of pages that appear in the manuscripts embodying the screenplays of "Effie" and "The Countess" that have been submitted to the court as exhibits. Rather, to accommodate for typographic and formatting differences in the documents, the court will refer to normalized pages of 200 words.

by the Ruskin family and, in particular, Mrs. Ruskin who seems intent on blocking any influence Effie might have held over John or herself. John's father is also introduced as well as John's servant George and Anna the lady's maid.

Inevitably the wedding night arrives. The viewer sees Effie beginning to disrobe and hears John say "you are perfect" but that is all. The next shot is of the couple in bed but John is asleep and Effie is silently crying. And that is all.

The film then proceeds to the next morning where it begins another extended look at Effie's daily life with the Ruskins. In both "Effie" and "The Countess" the couple never moves out of Denmark Hill as the historical Effie and John did six months after their wedding. Over sixteen pages Effie is shown continually looking for something to occupy herself but, at every turn, she is defeated. Accordingly, Effie's discontent with her situation grows and her relationship with Mrs. Ruskin grows increasingly bitter. Eventually Effie is relieved to think that she has finally found something meaningful to do: she will make herself a dress for the upcoming Royal Academy Dinner. When the night of the dinner arrives, Effie makes a dramatic entrance in the Ruskins' entrance hall, beaming, wearing an intensely pink frock. But the Ruskins are appalled and the film then pointedly cuts to the Royal Academy Dinner where Effie sits white-faced in a somber evening outfit.

At the Royal Academy dinner, the viewer is first introduced to Millais and Lady Eastlake. John is shown eloquently defending Millais and the Pre–Raphaelites against critics in the Academy and before the Academy's president, reiterating his and the PreRaphaelites' philosophy that honesty in depicting God's creation is more important than beauty. Effie interjects with a pointed question—"Do you think their painting pleases God?"—and attracts the attention of Lady Eastlake, who asks that she and her husband Charles, the Academy president, be invited to dinner.

Effie and the film then return to Denmark Hill. John is immediately engulfed by his mother at the slightest sign of a cough and Effie informs the Ruskins, to their shock, that the Eastlakes will be coming to dinner. The ensuing scenes depict the frantic preparations for the Eastlakes' arrival—new china is ordered and, when it does not perfectly match the walls, Mrs. Ruskin considers repainting. During the frenzy, however, Effie and George are able to steal a moment of peace together and form a bond of solidarity.

Eventually the day of the dinner arrives and Effie has come down with a headache from the stress of the preparations. At Mrs. Ruskin's insistence, Anna pressures Effie to take some overpowering medicine.

Finally the Eastlakes arrive and with the Ruskins they move into the drawing room where approximately two pages of dialogue pass before Lady Eastlake notices that Effie is missing. When Lady Eastlake asks after her, Mrs. Ruskin whirls up to Effie and John's bedroom where she brutally commands Effie to come down to dinner despite her headache.

When Effie does come down, it is plain to see that she is unwell. Lady Eastlake in particular takes note of this, as well as how thoroughly John ignores Effie. She takes Effie aside where Effie confides in her that she is unhappy in her marriage. Lady Eastlake, at this early stage, sees nothing to be done—all she can do is suggest that things will improve when children come along (which, of course, only cuts Effie deeper) and offer her assistance in the future.

When the Eastlakes leave, John harshly scolds Effie for her "performance" and the pain it has evidently caused his mother.

The scene then abruptly moves to Venice, another of the longer sequences in the screenplay at approximately sixteen pages. John refuses to be sociable, devoting his energy to his writing, but encourages Effie to go out on her own. Effie does just that, attending balls, making friends, learning Italian. Effie begins to spend a lot of time with a Venetian named Raphael (his name surely is no coincidence). John demonstrates no interest in this would-be romance, and Effie herself appears to regard their relationship innocently, though it is made clear that Venetian society has begun to take notice of their impropriety.

John continues with his work. While he seems to have come alive to Venice's beauty, he remains unable to connect with Effie. She reaches out to him, at one point by giving him a daguerreotype of Bernini's Apollo and Daphne, but he does not recognize the sculpture and does nothing to reciprocate her desire for a connection.

Meanwhile, Effie and Raphael have only grown closer together. Finally, as Effie makes a free-spirited attempt to pilot a gondola, Raphael makes the inevitable sexual advance. Effie recoils and runs back to her apartment. John is there working, of course, but he seems to take no notice of Effie's state when she runs in. She curls up alone in bed and hallucinates that her skin is being covered over by bark.

The film then returns to Denmark Hill. There relations between Effie, John, and the elder Ruskins only deteriorate. Things begin on a promising note with John attempting to engage Effie in conversation. But Effie seizes this moment to make a sexual advance of her own on John. Predictably, this ends in disaster. John is scandalized and Mrs. Ruskin, who was hovering nearby, swoops in to force pills on Effie. This time Effie fights back and both women have to be restrained by their husbands as Effie pushes Mrs. Ruskin into the fireplace and Mrs. Ruskin threatens to have Effie sent to an asylum.

Mrs. Ruskin drowns her outrage in brandy while a doctor is called to examine Effie who, eventually, is sedated. But the doctor seems to see things as they really are. For Effie he prescribes an iron tonic, some love and attention, and a vacation to her native Scotland away from Mrs. Ruskin. For John, he prescribes "sharper eye and a keener ear."

The viewer is then taken to the Royal Academy to listen in on a conversation between Millais and Lady Eastlake. In this way it is revealed that Lady Eastlake and Millais are friends and that, indeed, Effie and John will travel to Scotland for the summer with Millais joining them to paint John's portrait.

The film then immediately moves to Scotland and where the summer at Glenfinlas is underway. There, Effie, John, and Millais live close together in a cramped rustic cottage. Millais begins to paint John by the riverside. Meanwhile, however, a romantic bond begins to form between Effie and Millais. This goes on both right under John's nose and while he is away at Edinburgh lecturing. Effie is appalled to learn from Millais that John's story to the world is that he and Effie have reached a mutual decision to not have children. When John returns, Millais begins to see how cold John is to Effie and his affection for the man begins to turn to hate.

Eventually, the time comes to return to London, and the oppressive life at Denmark Hill. Effie initially refuses to return, but her resistance is overcome when John threatens to expose her "behavior" and destroy her reputation. The couple returns to London.

Back at Denmark Hill, however, things begin to move quickly. Effie is cheered somewhat by a visit from her sister who comes to stay with her at the Ruskins'. Nevertheless, Effie is now desperate for some sort of relief from her miserable life with John. She asks John directly if there is anything she can do to improve things, but John responds venomously, claiming that Effie "ensnared" him. Finally, Effie turns to Lady Eastlake and, at last, tells Lady Eastlake about her wedding night and that her marriage was never consummated.

Effie visits a doctor and a lawyer who confirm that it will be possible to annul the marriage provided that the marriage remains unconsummated. Effie, therefore, spends the night in fear next to John. But finally word arrives from Effie's lawyer and Effie and her sister Sophie, under the pretext of responding to a letter from home, leave Denmark Hill forever.

As Millais' portrait is shown being delivered to Denmark Hill, Effie is shown removing her wedding ring and placing it in an envelope to be sent back to John's mother.

John and the Ruskins are then shown admiring the Millais portrait when a lawyer arrives to serve Effie's annulment papers. At first the Ruskins mistake him for one of John's evidently-many admirers and gather around. John is then all the more humiliated when the lawyer announces (after much prodding from the Ruskins) that Effie has petitioned for an annulment "on the grounds of impotency."

Effie, meanwhile, asks the carriage driver to stop by Millais' house on her way back to Scotland. But she does not see him herself. Instead she sends Sophie who delivers the message that Effie loves him, but that she cannot see him immediately.

The film ends there.

## "THE COUNTESS"

Gregory's screenplay, like "Effie," begins on a metaphorical note. A candle flame is shown burning brightly but then ruthlessly snuffed out by John Ruskin's. John speaks. "Light deprived of shadow ceases to be enjoyed as light for Nature mingles her noble and inferior elements as she mingles light with shade." His open-minded artistic philosophy is thus immediately articulated, but is no sooner spoken than paired with an ominous visual. John's philosophy, the viewer is warned, is not as open-minded as it seems. Something radiant is soon to be smothered, notwithstanding John's avowed respect for the intrinsic coarseness in nature. But what?

The question is quickly answered—though a large audience is shown, rapturously engaged by John's lecture, a pair of close-ups establishes that the real matter at issue is the then-budding relationship between John and Effie Gray, who is sitting in the audience. Another close-up introduces the viewer to John Everett Millais and establishes that he too is a warm admirer of John's.

Things then move very quickly. John's influence and crucial support of the PreRaphaelites is established when a wealthy industrialist is shown revising his opinion of a Pre–Raphaelite work after learning of John's support of the school. Effie is then shown preparing for her wedding, though the normally jubilant pre-wedding atmosphere is infected with the same foreboding that contaminated the viewer's introduction to Effie. Just as quickly, the two are married, Lady Eastlake is established as a friend of the couple (wearing prescient expression of foreboding), and the story precipitously arrives at the couple's infamous wedding night.

The couple is shown traveling from the wedding ceremony to a hotel and then, in

the next shot, sitting in their darkened room, coming to terms with an unseen but still present disaster.

The screenplay then moves directly to Venice, where Effie is shown conquering Venetian high society. She is shown at a balls accompanied by the Eastlakes and her friend Charlotte Ker dancing with a handsome man. Glimpses of Effie enjoying herself with various handsome venetian men are interspersed with scenes of Lady Eastlake defending Effie's liberated attitude against scornful chattering by a Venetian onlooker. Later, however, Lady Eastlake is seen attempting to persuade John that he ought not leave his beautiful wife so alone in Venice.

John, so far, remains pleasant in his interactions with Effie even, at times, tender. But he is conspicuously uninterested in engaging with her at an emotional level. He writes home that Effie is "no better" and that the couple will be returning home.

And, indeed, the couple returns to England and is shown traveling by carriage from Dover to Denmark Hill. On the journey, however, Effie is disturbed to witness a terrified woman being led across the street to an asylum and to see the inmates pressed against the windows of the asylum as the carriage passes. The scene establishes the danger Effie will face in pursuing her own liberation from John and the insensible power he, as her husband, wields over her. Coming as it does just after the Ruskins and the viewer learn that John fears Effie is "no better" from her then-mysterious ailment, the scene suggests that such a fate might await Effie if she does not tread very carefully.

The couple then is shown arriving at Denmark Hill. Crawley, a Ruskin family servant, is briefly introduced as he is shown smiling at Effie with "great affection." John's parents are also introduced in a very brief dinner scene—John and his parents, so far, behave kindly towards Effie, though the impression is reinforced that the Ruskins harbor some unstated concerns about Effie's health.

The screenplay then moves to opening night at the Royal Academy in London. There, John and Millais are the center of attention, and the viewer quickly learns that Millais has been invited to join Effie and John on a trip to Scotland. Effie and Lady Eastlake are also shown conversing as friends, and Lady Eastlake further demonstrates her ahead-of-her-time pluck. John and Millais make the rounds together, both enduring dogmatic criticisms of the Pre–Raphaelite movement, and Millais manifesting his debt of gratitude to John for John's indispensible support for his art. Their conversation also reveals that fissures have continued to grow in Effie and John's marriage. John reveals that his discontent is rooted in his ironic idealization of women and his inability to tolerate the imperfections that emerge when they, like all natural things, are viewed up close. He poses a riddle: "How is it that all bachelors marry goddesses, but husbands live only with women?"

All the events described above occur within the first eleven pages of the screenplay.

Effie, John, and Millais are then shown leaving for Scotland with Lady Eastlake and John's parents present to see them off. Starting in this scene, Millais takes to calling Effie 'Countess,' the Historical Millais' nickname for Effie. Millais explains that, in the Highlands, "we might call ourselves anything we like" suggesting the possibility that Effie could still live a life of her own making if she could return to Scotland (either by traveling there through space or, perhaps backwards in time) or, more to the point, if she were with him instead of John.

The train departs and the group Effie, John, Millais, and Crawley are shown ar-

riving in Newcastle, then Stirling, and then finally in Brig O' Turk where they settle into a tiny cottage. The viewer sees a sign of John's continuing adoration of the idealized Effie when he unpacks a small framed sketch of a beautiful child, a child the viewer learns is actually a very young Effie Gray.

For a short time the group is shown enjoying their vacation—the men bathe under a waterfall and Effie cuts flowers. But the situation turns tense when Effie learns that John has thoughtlessly (or, perhaps, maliciously) left the cabin, leaving Effie alone with Millais. Millais begins to paint Effie's portrait. Effie comments that she does not make a fitting subject for a portrait—he is painting her sewing, with foxgloves in her hair. This gives him another opportunity to expound on the Pre–Raphaelite philosophy and connect it more directly than ever before to John's regard for Effie. "To idealize is to destroy—smother." Later, however, it is John who is alone with Millais and he takes this opportunity to warn him of Effie's "fits of anger and deep depression."

Next comes a brief church scene. Church in Scotland is, evidently, quite a different affair than one might expect from a Victorian-era church service. The congregation is rude and raucous and dogs freely roam the aisles. Whether historically accurate or not, the scene lends weight to Scotland's metaphorical role in the narrative: Scotland, in "The Countess," is evidently a wild place at odds with the Apollonian ideas of a theorist like John and a rule-bound environment like Victorian London.

The next day, Effie and Millais' relationship grows when Millais injures his thumb and Effie is called upon to bandage it. John, as usual, is out. It is clear that Millais is falling for Effie.

Later, one night, Effie and John have a heated argument. John insists that, to know peace, Effie must submit to her fate and that her bitterness makes a mockery of his love for her. Millais overhears the exchange through a wall.

The next morning, the viewer learns, along with Millais, that Effie has returned home to visit her family. There, we see that times are hard at the Gray household, and we learn that the Grays have received a letter from the Ruskins full of criticisms of their daughter Effie. Effie feels especially betrayed when she learns that the Ruskins wrote the letter at John's request.

Effie returns to the cottage and, at the first opportunity rummages through John's desk drawer for the notebook where he has been making notes on her behavior. But she has time only to glance through the notebook before she is caught in the act. John and Millais return and John, seeing the drawer in suspicious disarray, locks it.

Millais eventually comes to see the situation between John and Effie clearly and, once he does, he cannot keep from commenting. And as before Millais gives a voice to the unmistakable irony in John's treatment of his wife. When John complains that Effie is no longer the fascinating beauty she once was, Millais responds with words that sound like they might (should) have come out of John's own mouth: "Women, like men, are creatures of Nature, John, and Nature cares little what you believe." The conversation grows tense and John alludes to other "certain circumstances" that justify his attitude toward Effie—he is referring to the trauma of their wedding night—but he can go no further.

Some time later, Crawley and Effie are about to row out onto Loch Achray when, at the last moment, Millais sends Crawley off on an errand and takes over the rowing for himself. The two discuss Effie's time in Venice, and her commandeering of a

Gondola as John watches from the far shore.

More time passes and summer turns to fall. The group's return to London is drawing near. In the meantime, however, tensions between Effie, Millais, and John bring the situation to its boiling point. Millais makes an open offer to Effie to help her put an end to her troubles with John and it becomes clear to Effie that Millais has feelings for her. She tells John this, but John takes little interest and moves to leave the cottage. Effie, pushed to her breaking point, makes a sexual advance at John. John, of course, refuses and the couple finally have it out with one another. Effie accuses John of wanting not a real woman as his wife but a waxwork figure of one. John calls Effie willful and insolent and, dredges up the toxic memory of their wedding night.

Just then Millais enters, soaked from rain. He had left to get his hair cut but returned because he had been too late. John cruelly insists that Effie cut Millais' hair and leaves the two of them alone. Millais predictably takes this as an opportunity to declare his love for Effie and attempt to kiss her. But Effie, thrust into an impossible situation, refuses him.

Millais, unable to bear this torment any longer, moves out of the cottage and into the hotel. When John obliviously (or maliciously) asks Effie why she thought he moved out, Effie replies "What did you think would happen?" This precipitates another confrontation between John and Effie culminating in Effie's declaration of her love for Millais and her announcement that she will not return to London. But, in the end, she does travel back to London with John.

In "The Countess," the events of this Scotland vacation (if it can be called a vacation) consume approximately 31 pages of the screenplay.

Effie, John, and Crawley thus return to London and Denmark Hill where Effie is once again submerged beneath the Ruskins' criticisms and oppressive ways. John and his parents discover Effie's drawings of Millais in her sketchbook and there is some discussion about calling a doctor for Effie to treat her "fits" of depression and melancholy. Lady Eastlake, however, arrives at the house and her attempts to defend Effie from the Ruskins' notions of "female servitude" result in a bitter argument.

Some time after Lady Eastlake leaves, it looks as though relations between John and Effie might thaw somewhat—both seem to agree that a trip to Europe might make for a pleasant change of pace. But John insists on consulting his parents first and Effie is certain they forbid it.

Eventually, John caucuses with his parents and begins to read to them from his notebook, his log of Effie's supposed instability. The Ruskins agree that the notebook will be of great interest to the doctor they intend to call for Effie.

Having finished John's portrait, Millais arrives to deliver it. Effie, to her surprise, encounters him in the house and he informs her that he will be leaving for Egypt. The two finally kiss passionately but are interrupted by John's entrance into the room. Millais announces that his friendship with John is at an end.

The viewer then learns, through a short snippet of dialogue in Lady Eastlake's drawing room, that Millais has begun to lobby Lady Eastlake for some unspecified intervention. Lady Eastlake then comes to Denmark Hill to visit Effie, but John turns her away—the price, he says, for Effie's behavior. He tells Effie to "prepare yourself."

The Ruskins are seen meeting with a doctor. He reviews John's notebook and,

on that evidence, conclude that Effie will need "quiet," "cold immersions," and a "strictly supervised diet." He is suggesting that Effie, due to the "more delicate organization" of the female brain, will need to be institutionalized to help her overcome these "symptoms."

Lady Eastlake, meanwhile, intercepts Effie and Crawley outside the British Museum and they return to her townhouse for a conversation. Lady Eastlake indicates that Millais has asked her to intervene and bring's up John's notebook. Effie tries to defend John—she seems to have become convinced that she is to blame for her own plight. But eventually it is revealed, through an intense series of flashbacks, that Effie and John's marriage was never consummated due to John's disgust with Effie's body.

The screenplay then moves forward in time, but remains in Lady Eastlake's townhouse. A doctor emerges from a bedroom and confirms that Effie is a virgin and "properly formed."

A plan is then set into motion, which Crawley facilitates, for Effie to escape back to her parents in Scotland. Effie tells John that she must travel to her parents' because her sister's governess has eloped. At the appointed time, however, John moves to stop her from leaving saying she is in no condition to go anywhere. John opposes Effie's attempts to leave with a fervor that suggests he understands what is truly happening. But it is a *fait accompli*—Effie's carriage is ready and Crawley is standing ready with her bags. She and Crawley exchange meaningful smiles, and Effie is off for Scotland, never to return to Denmark Hill.

Next we see the Ruskins receiving a letter and legal papers from Effie's lawyer. The letter is addressed to Mrs. Ruskin and contains Effie's wedding ring as well as a note informing her that John never made her his wife. The Ruskins are scandalized

at this "lie" until John is forced to confess that what Effie has written is true. Scenes of Effie's journey away from Denmark Hill are interwoven with shots of John's descent into madness as he attempts the unenviable task of explaining the events of his wedding night to his parents.

The viewer learns that Effie has written to Millais that she will not marry him, but that Millais insists on hearing it from her lips. No sooner is this revealed, however, than the screenplay cuts to Effie, now a bride wearing the same memorable dress as she wore to her first unhappy marriage. It is then revealed that the groom is none other than Millais.

The screenplay ends with the couple's wedding night which, suffice it to say, is happier than Effie's first.

### Legal Standard

*Legal Standard on a Rule 12(C) Motion for a Declaratory Judgment*

▮ In deciding a Fed.R.Civ.P. 12(c) motion the court applies the same standard as it would in deciding a Rule 12(b) motion—a plaintiff must plead sufficient facts to state a claim for relief that is plausible on its face. *Ashcroft v. Iqbal,* 556 U.S. 662, 677–78, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009); *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). In deciding such a motion, a court must accept as true the facts alleged in the complaint, drawing all reasonable inferences in the plaintiff's favor, and may consider documents attached to the complaint, incorporated by reference into the complaint, or known to and relied on by the plaintiff in bringing the suit. *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.,* 493 F.3d 87, 98 (2d Cir.2007).

▮ Because this is an action for a declaratory judgment of *non*-infringement, plaintiff's burden on this motion is turned

on its head. Effie Film may prevail on its Rule 12(c) motion only if the pleadings establish that there can be no set of facts to support an action for copyright *infringement* by Murphy against Effie Film as a would-be defendant—or, in other words, that Effie Film would be entitled to judgment on the pleadings in any copyright infringement action brought against it by Murphy, relating to "The Countess" and "Effie." It should be emphasized that, in deciding this motion, the pleadings—including both Effie Film's complaint and Murphy's answer to it—are both taken to be true. Any inconsistencies between the allegations in these pleadings must be resolved in Murphy's favor. *See, e.g. Barber v. RLI Ins. Co.*, 06 Civ. 630, 2008 WL 5423106, at *1 (N.D.N.Y. Dec. 24, 2008).

*JURISDICTION TO ISSUE A DECLARATORY JUDGMENT*

■ For this dispute to be subject to the court's jurisdiction, it must present an actual controversy. This is both a statutory and constitutional requirement. *See* 28 U.S.C.A. § 2201; U.S. Const. art. III, § 2.

■ In general terms, this requirement is satisfied when "the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality." *Maryland Cas. Co. v. Pac. Coal & Oil Co.*, 312 U.S. 270, 273, 61 S.Ct. 510, 85 L.Ed. 826 (1941). The dispute must also be in such a posture that a court may provide "specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts." *Aetna Life Ins. Co. of Hartford, Conn. v. Haworth*, 300 U.S. 227,

241, 57 S.Ct. 461, 81 L.Ed. 617 (1937). *See also MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 126–27, 127 S.Ct. 764, 166 L.Ed.2d 604 (2007).

*COPYRIGHT INFRINGEMENT*[3]

■ To make a claim of copyright infringement a plaintiff must establish two elements: ownership of a copyright and the copying of original elements in the copyrighted work. *See Feist Publications, Inc. v. Rural Tel. Serv. Co., Inc.*, 499 U.S. 340, 361, 111 S.Ct. 1282, 113 L.Ed.2d 358 (1991). For the purposes of this motion there is no dispute that Murphy is the owner of the copyright in "The Countess" so the court is free to focus solely on the second component—copying.

■ For the purposes of establishing that the work was copied, in turn, a plaintiff must provide either direct evidence of copying or, more typically, provide evidence that the defendant had access to the copyrighted work and demonstrate that the plaintiff's and the defendant's works are substantially similar in their protectable elements. *Kregos v. Associated Press*, 3 F.3d 656, 662 (2d Cir.1993). For the purposes of this motion the Effie Film does not dispute that the creators of "Effie" had access to "The Countess." Thus the court may further focus its analysis on solely the question of substantial similarity.

■ This is a helpful concession because, for works of historical fiction like "Effie" and "The Countess," the substantial similarity analysis presents challenge enough. The difficulty comes from the facts that only "protectable elements" are to be compared in evaluating the similarity

---

**3.** Judge Oetken has recently provided an excellent analysis of copyright law as it applies to works of historical fiction, and even the "Effie" screenplay itself, in granting an analogous motion in another action brought by Effie Film against another author of a screenplay based on the same historical events. *Effie Film, LLC v. Pomerance*, 909 F.Supp.2d 273 (S.D.N.Y.2012).

of two works. In a work of historical fiction, very many elements of a work are drawn from historical events, not from the author's own creativity. Historical "facts" and interpretations themselves are not copyrightable, only their creative selection and arrangement to form a new work. *See Crane v. Poetic Products Ltd.,* 593 F.Supp.2d 585, 590 (S.D.N.Y.2009) *aff'd,* 351 Fed.Appx. 516 (2d Cir.2009)

Therefore, many of the key features of a work of historical fiction—it's plot, setting, characters—are largely excluded from the "protectable" realm and, accordingly, from the similarity analysis. "[W]e must attempt to extract the unprotectible elements from our consideration and ask whether the *protectible elements, standing alone,* are substantially similar." *Knitwaves, Inc. v. Lollytogs Ltd. (Inc.),* 71 F.3d 996, 1002 (2d Cir.1995). And, in fact, this formulation makes the task sound easier than it is. A literary work, like the screenplays at issue here, is not simply a collection of elements, the provenance of which may be traced back to the author's mind, to a history book, or elsewhere. Literature is not reportage just as history is not merely a collection of facts.

■ Even beyond the historical elements, however, the court must also exclude from its similarity analysis so-called *scènes à faire.* These are elements that are included in the work, not as a product of an author's creativity, but because they are obligatory given the work's other narrative and aesthetic choices. Thus, if a work is to be set in Victorian England, for example, travel by carriage, glittering ballrooms, stiff dinners, conversations over tea, and tensions arising from an overly-rigid system of class and gender roles are *de rigueur.* Similarly, when Venice is the backdrop, there can be little creativity in the decision to depict gondolas and canals. *See Walker v. Time Life Films, Inc.,* 784 F.2d 44, 50 (2d Cir.1986).

■ Thus, on the one hand, "the essence of infringement lies in taking not a general theme but its particular expression through similarities of treatment, details, scenes, events and characterization." *Reyher v. Children's Television Workshop,* 533 F.2d 87, 91 (2d Cir.1976). But on the other hand, courts "have disavowed any notion that we are required to dissect the works into their separate components, and compare only those elements which are in themselves copyrightable." *Peter F. Gaito Architecture, LLC v. Simone Dev. Corp.,* 602 F.3d 57, 66 (2d Cir.2010). Thus, all in all, perhaps the most that can be said is that the court must compare the works' "total concept and overall feel" as instructed by our "good eyes and common sense." *Id.*

■ Substantial similarity is a legal concept. Thus, so long as it has all the necessary facts before it, it is appropriate for the court to reach a decision on substantial similarity as a matter of law at the pleadings stage. *Peter F. Gaito Architecture, LLC v. Simone Dev. Corp.,* 602 F.3d 57, 64 (2d Cir.2010). Therefore, when all the relevant works are incorporated into the complaint, it is the court's role to simply read the works at issue, take judicial notice of relevant features of the works' historical setting, and conclude in the manner described above whether the works are substantially similar. *Id.*

## Discussion

*The Court Has Jurisdiction to Issue a Declaratory Judgment—An Actual Controversy Exists Between Effie Film and Murphy*

■ Murphy contends that there is no concrete justiciable controversy between himself and Effie Film because the "Effie" screenplay submitted to the court for evaluation is incomplete. Murphy alleges that Effie Film has conceded in an email to him

that, though the November, 2011 shooting script provided to the court was indeed the script used in shooting the film, some scenes may be rearranged and small segments of transitional dialogue may need to be added in post-production. Moreover, Murphy points out that while Effie Film asks for a declaratory judgment that its film does not infringe Murphy's copyright in "The Countess," Effie Film has not actually provided the film itself to the court for evaluation. Given the fact that Effie Film is not in a position to provide the film, and not in a position to represent that the finished film will correspond exactly to the shooting script provided for comparison, Murphy argues that the court may not grant a declaratory judgment of non-infringement as it relates to the film. And since the controversy between Effie Film and Murphy relates primarily to the film's putative infringement, and not the screenplay's, if the court is not able to give a declaratory judgment relating to the film, there is no justiciable controversy at all upon which the court's power to give a declaratory judgment might be predicated.

There is some merit to this argument. Certainly, without seeing the film, the court is unable to literally conclude that the film does not infringe Murphy's copyright. But this argument does not take Murphy as far as he suggests. It is also clear that the film "Effie" is all but certain to closely reflect the shooting script. This follows both from the parties' representations and from common sense. It is hardly a revelation that films are sometimes altered in minor ways during the post-production process in just the ways Effie Film has disclosed. But, while it may be technically possible to create an entirely different movie, as Murphy suggests, using these techniques, it seems highly unlikely that this will occur. To start with, it would be in Effie Film's economic interest to make as much use of the film it has already shot as possible. They would be

extremely foolish to invest years of work into a screenplay and the millions of dollars it must have cost to shoot using that screenplay only to concert the product of all that labor into something completely new during the editing process. This is all the more the case when Effie Film has invested resourced in pursuing this very litigation, the fruits of which would be entirely wasted if it ultimately releases a film called "Effie" but bearing little resemblance to the screenplay submitted to the court. And this is all to say nothing of the fact that Effie Film has made representations to the court regarding their intention to make a film that very closely matches the screenplay it has provided. Thus, while it remains a theoretical possibility that an opinion by this court on the similarity between "The Countess" and the "Effie" shooting script would not resolve the ultimate controversy between Murphy and Effie Film—whether the film itself infringes—common sense counsels to the contrary. A declaratory judgment by this court that the "Effie" shooting script does not infringe "The Countess," in any reasonably likely scenario, will settle the question of the film's non-infringement as well.

It should be noted that a contrary conclusion would render the Declaratory Judgment Act of little use to any filmmaker when it came to intellectual property concerns. At no time prior to actual completion and release of the film is any filmmaker likely to be able to represent that the film will exactly match its screenplay. But to allow this minor uncertainty to prevent her from obtaining a declaratory judgment of non-infringement would leave her with no choice but to proceed (or not) through the entirety of the filmmaking process from start to finish without knowing whether the completed film would be found to infringe some third party's copyright until the third-party decided to sue.

Even worse, such a third party may have an incentive to wait as long as possible before bringing such an action in the hopes of winning damages as well as an injunction, particularly if he had no plans to commercialize his work himself. This is just the sort of risk the Declaratory Judgment Act was designed to eliminate.

All the other jurisdictional prerequisites are met. There can be no question the Effie Film has the ability and intention to bring its film to market. And there can similarly be no doubt that Murphy's statements in the media and to Effie Film have created a very real controversy between himself and Effie Film.

Therefore, the court has the power to issue a declaratory judgment that the "Effie Film" shooting script does not infringe Murphy's copyright in "The Countess," and that the film "Effie" likewise does not infringe, to the extent it is faithful to the "Effie" shooting script that Effie Film has provided to the court.

But this will only be possible, of course, if the court concludes that "The Countess" and the "Effie" shooting script are not substantially similar.

*"Effie" and "the Countess" are not Substantially Similar*

The three most obvious observations, upon reading both "The Countess"[4] and "Effie" are also the most important. The two works have no dialogue in common, no characters in common that are not historical figures, and though they contain the same settings (a similarity attributable to their shared historical background) the two screenplays give these episodes vastly differing levels of attention. The result is two works narrating the same basic events but with greatly differing internal structures.

In "Effie," a great deal of the action occurs at the Ruskins' house at Denmark Hill and in Venice. By the time the narrative reaches the group's departure to Scotland, the story's conflicts and tensions are already quite acute. When John, Effie, and Millais move into a cabin, it is as though we are witnessing the final step of a cruel laboratory experiment in social chemistry. The reactants have already been mixed and heated—all that remains is to introduce the catalyst (Millais) and apply pressure. Compared to the structure of "Effie," "The Countess" is inside out. In "The Countess," the narrative proceeds with alacrity through the couple's wedding night, past Effie's first stay at Denmark Hill, and past the new couple's time in Venice before arriving in Scotland, where it settles into a much more leisurely and generous pace. While those opening scenes serve to establish characters and themes, and to introduce the film's central conflicts, their development and eventual denouement all largely occur in Scotland. In particular, in "Effie" a great deal of Effie's misery is more traceable to John's mother than to John himself. Thus, in "Effie," before John and Effie travel to Scotland, they linger for quite some time (and pages) at Denmark Hill where Effie is most directly exposed to Mrs. Ruskin's domination. The focus in "The Countess" away from Denmark Hill and towards Scotland reflects a corresponding focus in "The Countess" on John's own acts of cruelty. While John is a ghoulish character in both works, "The Countess" places greater emphasis on his disregard for Effie's repu-

4. The court has reviewed both the stage and screen versions of "The Countess" and found them sufficiently similar that they may be treated as identical for the purpose of the substantial similarity analysis that follows. The court will compare "The Countess" to only the "Effie" shooting script dated November 28, 2011 since it is that screenplay that was used in the filming of the movie "Effie" and which, accordingly, forms the subject of this dispute.

tation in leaving her alone with other men and his plotting to have her sent to an asylum. The time spent in the cabin at Glenfinlas in "The Countess" provides a corresponding focus on John's own acts, their effects on Effie, and the parallel evolution of Millais' relationships with Effie and John.

The comparison may be cast in more quantitative terms. In "Effie," the screenplay does not arrive in Scotland for approximately 80 pages. Of those 80 pages, approximately 45 are spent at Denmark Hill and approximately sixteen are spent in Venice. In "The Countess" the situation is very different. Effie, John, and Millais leave for Scotland only twelve pages into that screenplay. As in "Effie," the screenplay takes Effie and John to both Denmark Hill and Venice before traveling to Scotland but in "The Countess" Denmark Hill accounts for less than one page and Venice 3.5 pages.

Once the characters leave for Scotland, the screenplays remain very different. In "Effie" the screenplay remains in Scotland for about 22 pages while "The Countess" lingers for about 32. Accordingly, "The Countess" spends considerably more time developing the drama surrounding Effie's departure from Denmark hill. This spans approximately 27 pages in "The Countess" and 19 in "Effie."

It should be emphasized that these are not just differences in length. These numbers are, rather, an attempt to demonstrate what can really be truly appreciated only from reading the two works. When it comes to narrative structure, the two works are completely different. Though they contain analogous events, and travel through the same locations, thanks to their shared historical subject matter, the two works remain quite dissimilar in their two approaches to fictionalizing the same historical events.

There are other smaller, but still significant differences. Most noticeably, Mr. Ruskin, in "Effie" cuts a rather innocuous figure in comparison to Mrs. Ruskin. John is clearly in her thrall, not his father's, and it is her influence that so oppresses Effie. Mr. Ruskin, the screenplay implies, has simply managed to endure. In "The Countess," by contrast, Effie's abuse appears to be delivered by both of John's parents in roughly equal measure.

"Effie" also focuses on the metaphorical significance of naming and renaming in a way that "The Countess" does not. In "Effie," there are two characters named "John" whose names are, in effect, obliterated by their proximity to John Ruskin: John Everett Millais and John Ruskin's servant George (originally named "John" but unilaterally renamed by the Ruskins to avoid confusion). The screenplay also contains a discussion between Effie, Lady Eastlake, and an anonymous "Elegant Lady" about the absurdity of a woman's losing her own name to her husband. In an amusing bit of self reference, the anonymous "Elegant Lady" announces that she does not have the problem of losing her name, but the script moves on before she can explain and, indeed, before we learn her name. The screenplay thus highlights both the class and gender struggles of the Victorian era and locates Effie squarely at their intersection.

Likewise, "The Countess" contains elements missing in "Effie." Most conspicuously, "The Countess" seems to ascribe a darker and more deeply metaphorical significance to Scotland. Scotland's natural beauty is associated with its rejection of the refined forms that dominate London society, a theme further reinforced when Millais remarks that, in Scotland, Effie can have any name she wants. The name he chooses for· her (in a bit of irony—one would have expected a truly liberated Effie

to choose her own name), "Countess," of course takes on extra significance because it is the title of the screenplay. In this way, of course, "The Countess" does contain some reference to the metaphorical significance of naming, but the theme rarely rises to the surface of the narrative as it does in "Effie."

There are also important plot elements included in "The Countess" but missing from "Effie." "The Countess" resolves things neatly, with the happy marriage of Effie and Millais and the beginnings of John's descent into madness. In "Effie," neither of these developments is depicted. The "Effie" screenplay ends with Effie's ambiguous message to Millais that she will not be fit to marry for some time "because it would never do to be wretched twice." The audience learns that the Historical Effie and Millais married and that the historical John eventually went mad only through a series of cards after the film fades to black.

There are, however, some similarities between the works, even after controlling for their shared historical backgrounds. Murphy has pointed to numerous supposed "similarities" between the works. The court will not endeavor to address each of these specifically, though a few of the more significant purported similarities warrant some discussion.

*The Young Infatuated Manservant—Crawley v. George*

■ In both "Effie" and "The Countess" one of the Ruskin family manservants is a central character—Crawley in "The Countess" and George in "Effie." And in both the manservant character is introduced when he comes out to meet Effie upon her arrival at Denmark Hill. Murphy claims that it was his idea that the character should be young and infatuated with Effie. It is a matter of historical fact, however, that John Ruskin had two manservants during the course of his marriage

to Effie, one named Crawley and the other named "George" (his real name was John). Crawley, at least, was indeed young (he was in his early 20s) when he began working for John and he was indeed quite attached to Effie. The historical Crawley once said he would leave John's service when Effie left, and the historical Effie did actually trust him to help facilitate her escape.

■ These elements in the character Crawley are therefore un-protectable since they are drawn from historical facts. Murphy claims that in both works, however, the manservant is not just "affectionate" towards Effie but "infatuated." But this is a slender reed upon which to rest an argument for substantial similarity. Even if it were clear from the "Effie" screenplay (though it is not) that George is infatuated with Effie and not just affectionate towards her, this difference would fall far short of establishing substantial similarity between the works. Similarly, little can be inferred from the fact that both characters are introduced in the same manner. One supposes that, in Victorian times, it would have been very typical to first meet a household's servant when he came out to your carriage to carry your luggage. This is simply the natural way of introducing such a character and is, thus, a *scène à faire*.

*The Common Theme of Idealization and Dehumanization of Women*

■ Murphy contends that both screenplays focus on "the idealization of women and a denial of their humanity" which, he claims, was original to him. But a theme, of course, is not copyrightable. Therefore, the fact that another screenplay partakes of the same theme cannot render that screenplay substantially similar, without more to show that this was done using similar *expressions* of that theme.

*A "Greek Chorus" Is Employed to Show the Public's Aversion to Pre–Raphaelite Work*

 Both screenplays contain a scene where Lady Eastlake, John Ruskin, Effie Ruskin, and John Millais are together for the first time in the screenplay and a number of anonymous critics expressing their outrage at the pre-Raphaelite work before them, as though expressing the collective voice of the art world. But, as an initial matter, the fact that both screenplays use the device of a "Greek chorus" to establish the prevailing attitude of the art world towards pre-Raphaelite work is not a cognizable similarity. The "Greek chorus" is a theatrical device that exists for exactly this purpose, to express a prevailing attitude without ascribing it to any particular character. It is, however, a cognizable similarity that this device happens to be used in both screenplays when Lady Eastlake, John Ruskin, Effie Ruskin, and John Millais all appear together for the first time. But, though cognizable, this similarity is extremely insignificant, and contributes very little in establishing the similarity of the two works as a whole.

The same observations apply to the use of a Greek chorus in both works to establish Venice's attitude towards Effie and her conduct. But, in fact, the significance of this similarity is even less, since the two Greek choruses in Venice serve to establish differing attitudes on the part of Venetians. In "The Countess" Venice expresses its disapproval at John for leaving Effie to fend for herself. In "Effie" Venice's attitude is that Effie should be more careful about appearances.

*The Feminist Lady Eastlake*

 Murphy contends that his Lady Eastlake character is fictional—the real Lady Eastlake was hardly the feminist he has made her out to be, and would never have made the playful remarks that the Lady Eastlake character, in both "Ef-

fie" and "The Countess," makes to her husband. He contends that his Lady Eastlake is actually based upon a different historical person, Pauline Trevelyan.

Effie Film contends that its Lady Eastlake character is actually based on the historical Lady Eastlake. Murphy alleges, however, that Effie Film at one point represented to him that its Lady Eastlake character was not based on Lady Eastlake but, rather, is a synthesis of two different historical women. There is thus a factual dispute regarding the true historical inspiration of the Lady Eastlake character in "Effie." The court is required to resolve this factual question in Murphy's favor, and to assume that both Ladies Eastlake are based on the same historical woman. For the purposes of substantial similarity analysis, however, it matters little whom a fictional character is based upon.

 The question remains simply how greatly do the characters resemble one another, to the extent they differ from the historical Lady Eastlake. And in this light the characters are not similar in any cognizable way. Most importantly, it is not the case, as Murphy contends, that the Lady Eastlake character in "Effie" is a modern feminist. That characterization is far more apt for Murphy's own character. It is historically true, of course, that Lady Eastlake was an unusually accomplished, even trailblazing, woman. And, unlike "The Countess," the Lady Eastlake character in "Effie" appears not to go any farther than that. It may be, on the other hand, that like Murphy's Lady Eastlake, the Lady Eastlake in "Effie" may behave in a less restrained and decorous manner with her husband and the Ruskins that the historical Lady Eastlake. This similarity, however, is very small within the broader context of the work.

560

### Effie's Ruse to Leave Denmark Hill

■ In both works, Effie uses the same ruse to provide an excuse for her to escape Denmark Hill. She pretends, in both, to have received a letter calling her home. There is no historical analogue for this device, however, and it therefore does present a cognizable similarity between the two works. However, the historical Effie did decide that she would use a routine visit to her parents as an excuse to leave the house. Thus the cognizable similarity in the two works is simply that a letter was used to achieve this result. In the broader scheme of the two works, however, this similarity is of little significance, particularly given that there was hardly any other means, in Victorian times, for a daughter to arrange a visit to her parents other than by letter.

And there are, indeed, other similarities between the works.

In both, Effie makes a desperate but futile sexual overture towards John (though under differing circumstances). In both, soon after arriving in Scotland, John confides in Millais that his wife is troubled. In both, the bond between Effie and Millais is strengthened when she tends to an injury Millais sustained in Scotland—in "Effie" Millais wounds his nose, and in "The Countess" he injures his finger. Both injuries are matters of historical fact, but not Effie's tending to them. In both, Millais declares his love for Effie, soaked by the Scottish rain. In both, a conversation is depicted between Effie and Lady Eastlake where, over tea, Effie reveals that her marriage to John was never consummated. It is a matter of historical fact that Lady Eastlake learned of this somehow, though perhaps not in this precise manner. In both, Effie and John part ways at Denmark Hill under tense circumstances, and with John's manservant present. And in both, the Ruskins

initially mistake Effie's lawyer for a stranger, drawn by John's growing fame—though in "The Countess" he is mistaken for a reporter and in "Effie" he is mistaken for an adoring fan.

■ If the standard on this motion were that Effie Film must show that there are no similarities whatever between the works, the court would be obliged to deny the motion. But the test is whether the works are "substantially similar" in their "total concept" and "feel." And on this standard, the similarities pointed out by Murphy fall short rendering the works as a whole substantially similar.

### Conclusion

Accordingly, Effie Film's motion for judgment on the pleadings is granted. The shooting script of the film "Effie" dated November 29, 2011 is not substantially similar to either the stage or screen version of "The Countess." Thus, the November 29,2011 shooting script of "Effie" does not infringe Murphy's copyright in "The Countess," Similarly, the film based upon that screenplay also does not infringe, but only to the extent that it does not substantially deviate from the November 29, 2011 screenplay.

So ordered.